UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                      Chapter 11

FRGR MANAGING MEMBER, INC.,                                Case No. 09-11061

                              Debtor.                      **AFFIRMATION**
--------------------------------------------------------x

          MARK STERN affirms under penalty of perjury, as follows:

          1.      I am the Managing Member of Debtor FRGR Managing Member LLC ("Debtor").

          2.      I submit this affidavit in further support of FRGR's objection ("Objection") to the motion ("Motion") of the Office of the United States Trustee to dismiss the Debtor's Chapter 11 case.

          3.      I have reviewed the Affidavit of Ron Friedman filed this day, November 3, 2009, to which I am responding.

          4.      First, Mr. Friedman contends that the monthly operating reports filed in First Republic's case indicate that First Republic's net income for the period June 22, 2009 through September 30, 2009 was $257,268.26, which equates to an annual net income of approximately $1 million, as opposed to the $5 to $6 million of net income set forth in FRGR's Objection to the motion to dismiss.

          5.      The flaw in Mr. Friedman's contention is that the monthly reporting reports excerpts, which are attached to his affidavit, include Chapter 11 legal fees of about $200,000 per month, and a reduction of about $250,000 per month for depreciation. Since Chapter legal fees are not a regular expense and since depreciation is not an expense at all, the operating report excerpts understate projected income by in excess of $5 million.

6.     Indeed, Michael Kelly, a then Citibank employee and First Republic's president, at the first meeting of creditors in the First Republic case, testified at pages 27 to 28 of the transcript thereof, a copy of which is annexed hereto as Exhibit A, that the 2008 cash flow was $4 to $5 million: "The cash flow generated from the property that I'm aware of after payment of debt service was approximately $4 to $5 million."

7.     Such cash flow is consistent with the $137 million December 2008 appraised value of the First Republic shopping malls (Exhibit B). The total value of First Republic's assets is $145 million, including the $8 million of cash as of the filing date – which is far in excess of the $111,150,000 due to Citigroup under its note and mortgage.

8.     In summary, First Republic generates a very substantial amount of net income, and FRGR's goal is to recover that value in its Chapter 11 for the benefit of the FRGR bankruptcy estate.

9.     With respect to the amounts deposited in the TD Bank Account maintained by Republic Funding, LLC ("Funding"), it must be noted at the outset that such funds were not rental proceeds, but rather, the transfers represented payment for tenant alterations that had been assigned to First Republic Group, Corp. ("Corp."), which in turn assigned such payments to Funding, in exchange for Corp. having have paid for substantial First Republic shortfalls. Copies of the assignments are annexed hereto as Exhibit C.

10.    By way of background, FRGR has been complaining repeatedly to all courts in which it found itself, and to Citigroup before that, that Citigroup was choking the Debtor off from its cash flow to the point that the Debtor was unable to service its tenants. Thus, at least during FRGR's ownership of First Republic, Citigroup unnecessarily accumulated

reserves in the millions of dollars, and drawing on its control of the lockbox into which rents were deposited, left First Republic unable to pay its bills.

11.    Accordingly, Corp. agreed to fund certain shortfalls, and Corp. took an assignment of the U.S. Army payments for such shortfalls, which it then assigned to Funding. Consequently, when the checks were received, therefore, pursuant to the assignments, I caused them to be transferred to Funding.

12.    The same holds true with respect to the Dollar Tree transfers.  Again, I do not believe that any of the funds received represent rents, but rather I believe the funds represent reimbursement for alterations, and that Funding was entitled to those funds pursuant to the assignments.

13.    In any event, I arranged to have the entire $135,764.26 disputed amount placed in escrow with Backenroth Frankel & Krinsky, LLP so that this issue does not prejudice First Republic or FRGR.

14.    Based upon the foregoing, FRGR respectfully requests that the Bankruptcy Court deny the motion to dismiss.

Dated: Monsey, New York
        November 3, 2009

                                         s/Mark Stern
                                         _____
                                         Mark Stern

Exhibit A

OFFICE OF THE UNITED STATES TRUSTEE
CHAPTER 11

------------------------X

IN THE MATTER OF:

    First Republic Group Realty, LLC

                                        Case No.:
                                        09-13983

------------------------X

                  August 5, 2009

BEFORE:             MAZAR KHODOROVSKY
                  Judge

APPEARANCES:      ADAM ROSEN, ESQUIRE
                  Attorney for First Republic Group
                  Realty

TRANSCRIBER:      TRISHA RUCKART

```
                    INDEX


            W I T N E S S E S

PETITIONER:                        RE      RE    V.
WITNESS        DIRECT    CROSS    DIRECT   CROSS  D.    J


RESPONDENT:                        RE      RE    V.
WITNESS        DIRECT    CROSS    DIRECT   CROSS  D.    J



            E X H I B I T S

PETITIONER:
IDENTIFICATION      DESCRIPTION           I.D.   IN EV.


RESPONDENT:
IDENTIFICATION      DESCRIPTION           I.D.   IN EV.
```

1

 1              MAZAR KHODOROVSKY:  Let the record reflect

 2       that the date is August 5th, 2009, and the time is

 3       2:33 p.m.  The name of the case is First Republic

 4       Group Realty, LLC, Docket number 09-13983.  The case

 5       has been assigned to Judge Glenn.  Good afternoon.

 6       My name is Mazar Khodorovsky.  I'm an attorney at the

 7       Office of the United States Trustee, a component of

 8       the Department of Justice, and I will be the

 9       presiding officer at this hearing.  The United States

10       Trustee supervises the administration of bankruptcy

11       cases under the bankruptcy code.  The debtor is

12       required to appear to be examined under oath

13       regarding the bankruptcy case.  The examination will

14       be recorded.  All persons questioning the debtor must

15       state their names and indicate who they represent.

16       At this time I'd like to swear in the debtor's

17       representative.  Please raise your right hand.  Do

18       you swear or affirm to tell the truth, the whole

19       truth and nothing but the truth?

20              MICHAEL KELLY:  I do.

21              MR. KHODOROVSKY:  You may lower your right

22       hand.  Will you please state your full name for the

23       record.

24              MR. KELLY:  Michael Kelly.

25              MR. KHODOROVSKY:  Can you please spell your

1    name for the record?

2                MR. KELLY:  M-i-c-h-a-e-l K-e-l-l-y.

3                MR. KHODOROVSKY:  Mr. Kelly, what is the

4    current address of First Republic Group Realty?

5                MR. KELLY:  It's owned by Commercial

6    Liquidation Properties, which has an address of 388

7    Greenwich Street, New York, NY  10013.

8                MR. KHODOROVSKY:  388 Greenwich Street?

9                MR. KELLY:  Yes.

10                MR. KHODOROVSKY:  Mr. Kelly, where do you

11    reside?

12                MR. KELLY:  Full address?

13                MR. KHODOROVSKY:  Whatever your convenient

14    disposal.

15                MR. KELLY:  Glenrock, New Jersey.

16                MR. KHODOROVSKY:  What is your relationship

17    to the First Republic Group Realty?

18                MR. KELLY:  I am now the president of First

19    Republic Group Realty.

20                MR. KHODOROVSKY:  Do you own any equity in

21    the company?

22                MR. KELLY:  I do not.

23                MR. KHODOROVSKY:  Do you hold any titles

24    beyond president?

25                MR. KELLY:  We have five directors so I'm

1    one of the directors.

2              MR. KHODOROVSKY:  Is First Republic Group

3    Realty currently represented by an attorney here

4    today?

5              MR. KELLY:  It is.

6              MR. KHODOROVSKY:  Counsel, please identify

7    yourself and note your appearance.

8              ADAM ROSEN:  Adam Rosen, Silverman Acempoor

9    [phonetic] LLP, proposed counsel for First Republic

10   Group Realty.

11             MR. KHODOROVSKY:  Creditors and other

12   parties and interests, can you identify yourselves

13   and note your appearances.

14             ROBERT SASLOF:  Robert Saslof [phonetic]

15   from the firm Robinson Broad - - , and I represent

16   five unsecured creditors.

17             STEVEN STERN:  Steven Stern [phonetic] with

18   the first - - Stern and Ross, creditor of the debtor.

19             ROBERT LEE HANE:  Robert Lee Hane, Kelly,

20   Troy and Warren [phonetic] on behalf of Jones, Lang,

21   Lasalle, Americas [phonetic], creditor of the debtor.

22             NICHOLAS:  Nicholas - - , and Gross, - - .

23             ELISE FRANKEL:  Elise Frankel, - - and

24   Frankel, counsel for the Citigroup.

25             MR. KHODOROVSKY:  Anybody else?  Any other

1      creditors?  If you can't be heard to make your

2      appearance, please just come by the table.  If you're

3      far away, just please come by because otherwise you

4      will not be heard.

5              OLIVIA LEE:  Olivia Lee, Schrager and

6      Schrager [phonetic] on behalf of - - creditor of the

7      debtor.

8              MR. KHODOROVSKY:  Have all the creditors or

9      other parties of interest here who wanted to make

10      their appearance made their appearance?  Hearing

11      silence, I will begin.  Mr. Kelly, is what I'm

12      showing you now the bankruptcy petition of First

13      Republic Group Realty?

14              MR. KELLY:  Yes.

15              MR. KHODOROVSKY:  Mr. Kelly, did you sign

16      the bankruptcy petition of First Republic Group

17      Realty?

18              MR. KELLY:  I did not.

19              MR. KHODOROVSKY:  Who signed the bankruptcy

20      petition of First Republic Group Realty?

21              MR. KELLY:  Mark Stern.

22              MR. KHODOROVSKY:  Can you explain why you're

23      currently the president of the company and why Mark

24      Stern is not present here today?

25              MR. KHODOROVSKY:  Mark Stern was a former

1    president of First Republic Group Realty.  He was

2    replaced after Citigroup foreclosed on the mezzanine

3    loan that it held on FRGR on June 23rd.

4              MR. KHODOROVSKY:  June 23rd of which year?

5              MR. KELLY:  Of 2009.

6              MR. KHODOROVSKY:  Mr. Kelly, has First

7    Republic Group Realty, LLC filed its schedules and

8    statements of financial affairs?

9              MR. KELLY:  Not yet.

10             MR. KHODOROVSKY:  When does First Republic

11   Group Realty to which I'll also refer as the debtor

12   expect to file its schedules and statements of

13   financial affairs?

14             MR. KELLY:  On or before August 24th.

15             MR. KHODOROVSKY:  Of this year?

16             MR. KELLY:  2009, sorry.

17             MR. KHODOROVSKY:  Okay.  Now, Mr. Kelly,

18   first are you familiar with the financial affairs of

19   First Republic Group Realty.

20             MR. KELLY:  Somewhat, yes.

21             MR. KHODOROVSKY:  Why do you say somewhat?

22             MR. KELLY:  Because Citigroup just recently

23   foreclosed to take ownership.  So, we have received

24   some of the information but not all of the

25   information.  We are still working through counsel

1    trying to obtain everything else that we need to get

2    our--to gather everything on First Republic Group,

3    bank accounts.  There are just certain issues that we

4    need more time to address.

5           MR. KHODOROVSKY:  So, what information do

6    you still need in order to become fully acquainted

7    with the financial affairs of First Republic Group

8    Realty?

9           MR. KELLY:  That's hard to say without

10   knowing what we're missing.

11          MR. KHODOROVSKY:  Maybe counsel can help

12   you.

13          MR. KELLY:  We believe there are other bank

14   accounts that we have not had access to.  We do not

15   have certain documents.  We're still going through

16   everything.  The only information that we've really

17   been given has been given to us by Jones Lang

18   Lasalle.  We have not received really any information

19   from the former owner.

20          MR. ROSEN:  I would say that the--

21          MR. KHODOROVSKY:  [interposing]  Please

22   identify yourself, please.

23          MR. ROSEN:  Adam Rosen, Silverman - -

24   opposed counsel to the debtor.  I would say that the

25   financial information supplied to us by Jones Lang

1    Lasalle has given us a complete view of the financial

2    affairs of the properties as operating properties.

3    However, when you ask the general question of the

4    financial affairs of First Republic Group, Mr. Kelly

5    and my office have not received complete information

6    regarding every bank account that First Republic

7    Group might have in its name, claims that First

8    Republic Group might have, an ability to assert,

9    etcetera, so at this early stage it would be

10   impossible for Mr. Kelly to, you know, have complete

11   knowledge of those types of things. I just want to

12   add one other thing, and that is that we filed a 2004

13   exam application, and it was granted, I think last

14   week, regarding Citizens Bank to try to investigate

15   whether First Republic Group has an interest in the

16   Citizens Bank account.  And I believe today or

17   tomorrow we will be filing another 2004 application

18   regarding another bank account.  So, we've started

19   that process, and we expect that process to continue

20   over the next few weeks.

21           MR. KHODOROVSKY:  I understand.  Has First

22   Republic Group Realty filed for bankruptcy before?

23           MR. KELLY:  No.

24           MR. KHODOROVSKY:  Have you yourself or to

25   the best of your knowledge any present or former

1    principles of First Republic Group Realty have they

2    filed for bankruptcy before?

3                    MR. KELLY:  The--

4                    MR. KHODOROVSKY:  [interposing]  Well let's

5    start with you yourself.  Have you yourself filed for

6    bankruptcy?

7                    MR. KELLY:  I have not.

8                    MR. KHODOROVSKY:  What about other current

9    principles of the company?

10                   MR. KELLY:  The entity that held the shares

11   of First Republic Group Realty, FRGR LLC, filed for

12   bankruptcy on March 9th, 2009.

13                   MR. KHODOROVSKY:  And what's the status of

14   that bankruptcy case?

15                   MR. KELLY:  Unknown to me.  We're not--we're

16   not involved.

17                   MR. ROSEN:  That case is pending before

18   Judge Lithlan [phonetic], has separate counsel.  It

19   has been reassigned a judge--okay, well it was with

20   Judge Lithlan.  It's been reassigned, has different

21   counsel, and we haven't had any involvement in that.

22                   MR. KHODOROVSKY:  Have any business in which

23   you or other principles of First Republic Group

24   Realty--I'm sorry, let me re-phrase.  Have any

25   businesses in which you or other principles of First

1    Republic Group Realty, in which you own or they own a

2    controlling interest, has that business filed for

3    bankruptcy before?

4         MR. KELLY:  Mark Stern, the former principle

5    president of First Republic Group Realty had several

6    other companies that he owned all or part of.  My

7    understanding of it is several of those have filed

8    bankruptcy previously.  I could not name them though.

9         MR. KHODOROVSKY:  Can you name any?

10        MR. KELLY:  No.

11        MR. KHODOROVSKY:  Counsel, maybe can you

12   help?

13        MR. ROSEN:  I cannot.  I have no information

14   about former bankruptcies.

15        MR. KHODOROVSKY:  Okay.  Has the company, by

16   company I mean First Republic Group Realty, LLC, has

17   it opened a post-petition bank account, or has it

18   obtained an appropriate order from the Court

19   authorizing it to use its existing bank account?

20        MR. KELLY:  Yes, we've obtained

21   authorization from the court to continue to operating

22   using the cash management agreements in place and

23   cash collateral order.

24        MR. KHODOROVSKY:  Now, let me ask you this.

25   In which banks does First Republic Group Realty to

1   the best of your knowledge currently maintain bank

2   accounts?

3           MR. KELLY:  There are lock box accounts

4   maintained by Harris Bank in which all tenant rents

5   have been directed to be deposited.

6           MR. KHODOROVSKY:  Is that all, or are there

7   other bank accounts?

8           MR. KELLY:  Well, those--there are--there's

9   a bank account at Wachovia that's in the name of

10  First Republic but that's pledged to City Group as

11  collateral for its loan.

12          MR. KHODOROVSKY:  Now, do you know the

13  addresses of the bank branches where these accounts

14  are located?

15          MR. KELLY:  It's not a branch.  It's a lock

16  box in Chicago.  There are--it's Treasury Way in

17  Chicago, Illinois.  Each of the accounts has a

18  different PO box attached to it.  We can get you a

19  list of the accounts if you need the addresses.

20          MR. KHODOROVSKY:  Yes, I would like the

21  addresses of the accounts.  Counsel, would it be

22  possible to provide my office with a list of these

23  addresses in the next two weeks by August 19th?

24          MR. ROSEN:  Sure.

25          MR. KHODOROVSKY:  And that would also

1    include the Wachovia account, the address of the

2    branch or the P.O. Box where it is.

3                MR. KELLY:  That's fine.

4                MR. KHODOROVSKY:  Does First Republic Group

5    Realty presently carry any insurance policies for

6    fire, theft, liability, worker's compensation,

7    disability, vehicle, product liability, flood, or

8    other coverage customary or prudent in the industry?

9                MR. KELLY:  Yes, on all of the properties.

10               MR. KHODOROVSKY:  Do you have copies of any

11   of the insurance certificates or insurance binders

12   with you today?

13               MR. KELLY:  I do not.  I didn't realize I

14   needed them.  We can get you those though.

15               MR. KHODOROVSKY:  Okay, I would like to

16   request that by--again, by August 19th, counselor

17   would it be possible to provide my office with copies

18   of the insurance certificates?

19               MR. ROSEN:  Okay, for every property?

20               MR. KHODOROVSKY:  For all of the properties,

21   and if these certificates don't cover a particular

22   property with let's say their worker's compensation,

23   let's say worker's compensation for the entire

24   company, then those should also be provided.

25               MR. ROSEN:  Okay.

1          MR. KELLY:  The worker's compensation may

2      actually be provided by JLL as part of our management

3      agreement, but we can get you all the detail on all

4      that.

5          MR. KHODOROVSKY:  I would appreciate it.

6      Has First Republic Group Realty opened post-

7      bankruptcy books and records?

8          MR. KELLY:  We are in the process of

9      engaging accountants that will allow us to do that.

10         MR. KHODOROVSKY:  When do you expect to have

11     accountants retained?

12         MR. KELLY:  I would say in the next two

13     weeks.

14         MR. KHODOROVSKY:  Currently, where are the

15     books and records of the company located?

16         MR. ROSEN:  I'll let Mr. Kelly answer, but

17     from counsel's point of view, again Jones Lang

18     Lasalle keeps the records of all tenant receipts,

19     property taxes, lease payments, everything with

20     respect to the property, and they provide us with

21     information and copies of whatever we need.  So, with

22     respect to the properties Jones Lang Lasalle is a

23     full-service management company.  With respect to the

24     other books and records, which we're investigating

25     and we don't know the extent or the existence of

 1       which it's hard to say.

 2              MR. KHODOROVSKY:  But what about--what

 3       about--what about ones that are not with Jones Lang

 4       Lasalle and ones of whose existence you're aware?

 5       Where are those located?

 6              MR. ROSEN:  First Republic Group--the only

 7       thing it owns are the 11 properties, so all of the

 8       books and records so far that have been needed since

 9       Citigroup foreclosed have been property-related.  All

10       of the cash flow for the company can be tracked

11       through the lock box agreement or the lock box

12       accounts, and the sweep account held by Wachovia.

13       And that's maintained in combination with Jones Lang

14       Lasalle and Wachovia who services the loan.

15              MR. KHODOROVSKY:  So let me ask you this

16       question, a more direct one then.  Are there any

17       books and records of First Republic Group Realty, LLC

18       located at your offices of 388 Greenwich Street in

19       New York, NY?

20              MR. KELLY:  There are copies of the

21       financial statements that we've received from Jones

22       Lang Lasalle.  We have access through Jones Lang

23       Lasalle's share point site where we can obtain

24       anything that we need on any of the properties

25       directly or we can ask Jones Lang Lasalle for it and

1   they deliver it to us.  So it's maintained at 388

2   Greenwich Street through our computer systems.

3           MR. KHODOROVSKY:  Okay, can you briefly

4   describe the background and the nature of the

5   business of First Republic Group Realty?

6           MR. KELLY:  Sure.  It was established in

7   July of 2007 to acquire 11 shopping centers from

8   Colonial Realty.  At the time, it borrowed, First

9   Republic Group Realty borrowed $111 million from

10  Citigroup, and then there was a $15 million mezzanine

11  loan that was provided to its parent entity, FRGR

12  also by Citigroup.  It's been run for two years

13  owning and operating the 11 shopping centers.

14          MR. KHODOROVSKY:  Who started the company?

15          MR. KELLY:  The former owner, Mark Stern.

16          MR. KHODOROVSKY:  Currently who are the

17  shareholders or equity holders of First Republic

18  Group Realty, LLC?

19          MR. KELLY:  At this point, First Republic

20  Group Realty is owned by Commercial Liquidation

21  Properties One.

22          MR. ROSEN:  LLC.

23          MR. KELLY:  LLC, sorry.

24          MR. KHODOROVSKY:  And how much--it owns 100%

25  of the equity in that company?

1    MR. KELLY:  Yes, which it acquired through

2    foreclosure on June 23rd, 2009.

3            MR. KHODOROVSKY:  So the foreclosure that

4    you have discussed, was that the only change in stock

5    ownership since the company was founded?

6            MR. KELLY:  Yes.

7            MR. ROSEN:  Well, as far as you know.

8            MR. KELLY:  As far as I know, yeah.

9            MR. ROSEN:  Because you can't be sure of

10   whether the stock holders changed prior to the

11   foreclosure.

12           MR. KELLY:  That's true.

13           MR. KHODOROVSKY:  Do you yourself or any

14   other present stockholders, officers, or directors of

15   the company, do they have controlling stock ownership

16   interest in any other business?

17           MR. KELLY:  I don't.

18           MR. ROSEN:  I'm sorry, could you repeat the

19   question, any officer or director?

20           MR. KHODOROVSKY:  With regards to current

21   officers or directors of the company including any

22   equity holders of the company, do they have

23   controlling stock ownership interest in any other

24   business?

25           MR. KELLY:  I cannot speak to the

1    independent directors and what they own of any other

2    companies.  I can--

3              MR. KHODOROVSKY:  [interposing]  What about

4    not independent directors?

5              MR. ROSEN:  What about you?

6              MR. KELLY:  Well, I can tell you I do not

7    own anything.  I do not know for Bill Cahill

8    [phonetic] or Phil Holmes [phonetic].

9              MR. ROSEN:  I can follow up.  This is Adam

10   Rosen.  I'll follow up with regard to the other board

11   members to find out if they have controlling stock

12   interest in any other company.

13             MR. KHODOROVSKY:  Yes.

14             MR. ROSEN:  Okay, I'll ask that question.

15             MR. KHODOROVSKY:  Can you provide that

16   information to us by letter by August 19th?

17             MR. ROSEN:  Same deadline.

18             MR. KHODOROVSKY:  Now, in the course of your

19   investigation with regards to Mr. Stern, have you

20   been able to find out if Mr. Stern has controlling

21   stock ownership interest in any companies, any other

22   companies?

23             MR. ROSEN:  Well, let me interrupt.

24             MR. KHODOROVSKY:  Yeah.

25             MR. ROSEN:  The investigation that the

1    company may be doing with respect to Mr. Stern is

2    confidential, and I'm not sure it's something we

3    should say on the record if there's something for him

4    to say at all.  I'm not sure there is.  So, is it

5    necessary to talk about the merits of the

6    investigation on the record?

7            MR. KHODOROVSKY:  I'm just asking about

8    facts.  If you're confident in disclosing--are you

9    confident in disclosing any other companies that you

10   know right now in which you know Mr. Stern has a

11   controlling stock ownership interest?

12           MR. KELLY:  I'm not comfortable discussing

13   any of it at this point.

14           MR. KHODOROVSKY:  Okay, let me ask you this

15   then.  Currently, officers and directors of First

16   Republic Group Realty, do they get compensated?

17           MR. KELLY:  The independent directors do.

18           MR. KHODOROVSKY:  And how much do they get

19   compensated?

20           MR. KELLY:  Fifty thousand dollars a year

21   each for the independent directors.

22           MR. KHODOROVSKY:  So there are two

23   independent directors, right?

24           MR. KELLY:  Yes.

25           MR. KHODOROVSKY:  So it's a total of

1    $100,000 per year.

2              MR. KELLY:  Yes, plus expenses.

3              MR. KHODOROVSKY:  And non-independent

4    directors, do they get compensated from the company?

5              MR. KELLY:  Non-independent directors are

6    employees of Citigroup.

7              MR. ROSEN:  And do they get compensated?

8              MR. KHODOROVSKY:  do they get compensated

9    from First Republic Group Realty?

10             MR. KELLY:  No, they do not.  They are

11   compensated by Citigroup.

12             MR. KHODOROVSKY:  With regards to all other

13   employees of First Republic Group Realty both full-

14   time and part-time, what's the payroll yearly or

15   monthly?

16             MR. KELLY:  There are no other employees of

17   First Republic Group Realty at this point.

18             MR. KHODOROVSKY:  What about independent

19   contractors?

20             MR. KELLY:  Again, at this point we have not

21   engaged any other independent contractors.  We hired

22   Jones Lang Lasalle, continue to engage Jones Lang

23   Lasalle to manage the properties for us.  They are

24   paid a management fee of approximately $54,000 a

25   month plus payroll expenses and other miscellaneous

1    expenses incurred by them.  In addition, they have

2    engaged on our behalf security companies, landscaping

3    companies and those types of entities.

4        MR. KHODOROVSKY:  I understand.  So you

5    spoke about payroll expenses that you advance to

6    Jones Lang Lasalle.  How much are these payroll

7    expenses monthly?

8        MR. KELLY:  Can I check my--

9        MR. KHODOROVSKY:  [interposing]  You can

10   definitely, if you need to, check some document or

11   notes.

12       MR. KELLY:  Yeah.

13       MR. KHODOROVSKY:  Definitely, take your

14   time.

15       MR. KELLY:  Okay.  It varies, but it's

16   probably $500,000 a year.

17       MR. KHODOROVSKY:  Okay, that's fine.

18       MR. KELLY:  Approximately.

19       MR. KHODOROVSKY:  That's fine.  Currently,

20   does the company owe the state, or owe any state or

21   the Internal Revenue Service withholding taxes with

22   regard to any pre=petition employee wages?

23       MR. KELLY:  I do not know.

24       MR. KHODOROVSKY:  Has the--do you know if

25   the Internal Revenue Service has filed a proof of

1        claim in the case?

2                 MR. KELLY:  I do not know.

3                 MR. KHODOROVSKY:  Okay, including payroll

4        that we have discussed before, what are the total

5        monthly expenses associated with running First

6        Republic Group Realty?

7                 MR. KELLY:  Including property operating

8        expenses?

9                 MR. KHODOROVSKY:  Yes.

10               MR. KELLY:  Okay, including the management

11       fees, the payroll, it's approximately $550,000 a

12       month.  On top of that that's operating expenses.

13       That does not include real estate taxes, which would

14       average about $200,000 more a month and also does not

15       include insurance premiums, which would be around

16       $30,000 a month.

17               MR. KHODOROVSKY:  Has the company undertaken

18       any efforts to cut any expenses?

19               MR. KELLY:  Since the bankruptcy?

20               MR. KHODOROVSKY:  Yes, or even before the

21       bankruptcy to the best of your knowledge.

22               MR. KELLY:  Prior to the bankruptcy, Jones

23       Lang Lasalle and First Republic had been diligently

24       trying to reduce expenses as the occupancy of the

25       properties had dropped.  The number of employees were

1    reduced so they were trying to reduce expenses.

2              MR. KHODOROVSKY:  Is the company late or

3    behind on any post-petition payments?

4              MR. KELLY:  It's a little difficult to

5    explain.  The way the cash management system works is

6    there is a monthly disbursement for operating

7    expenses, which is scheduled for the 9th of each

8    month.  So, there may be some bills that are

9    outstanding now, which will be brought current next

10   week.  So, if someone submitted an expense July 15th,

11   they have not been paid yet, but they will be paid as

12   the waterfall is dispersed on August 9th.

13             MR. KHODOROVSKY:  Now, is the company up to

14   date with any post-petition rent payments?

15             MR. KELLY:  There are no--as far as I know

16   there are no post-petition rent payments that the

17   company owes to anyone.

18             MR. KHODOROVSKY:  Now, I presume the company

19   is currently operating, right?

20             MR. KELLY:  Yes.

21             MR. KHODOROVSKY:  In order to continue its

22   operations, will the company need any licenses, or

23   does the company need to maintain any licenses in

24   order to operate?

25             MR. ROSEN:  I'm not aware of any licenses?

1      MR. KHODOROVSKY:  With regards to the

2  properties that the company owns, during the past

3  year have there been any fire code violations or

4  municipal code violations on the premises of the

5  companies?

6      MR. KELLY:  I couldn't say.  We would have

7  to check with Jones Lang Lasalle, and they may not

8  even know.

9      MR. KHODOROVSKY: Okay, how long do you think

10  it will take you to find that out?

11      MR. ROSEN:  We'll do it in the same time

12  frame if that's okay, but I just want to be clear.

13  Fire code violations?

14      MR. KHODOROVSKY:  Or municipal or other

15  municipal code violations on the properties.

16      MR. ROSEN:  Okay, I'll find that out.

17      MR. KHODOROVSKY:  Okay, so I would like that

18  information if possible again by August 19th.  If you

19  need additional time for that, give me a call or

20  write to me.

21      MR. ROSEN:  That's fine.

22      MR. KHODOROVSKY:  Now you've stated before,

23  Mr. Kelly that the company does not owe rent to

24  anybody, but with regards to personal property, is

25  the company leasing any personal property, like

1   vehicles or equipment?

2           MR. KELLY:  There are vehicles that are

3   owned and used at a couple of the properties.  My

4   understanding is that those vehicles are owned

5   outright.

6           MR. KHODOROVSKY:  Are there any car loans

7   with regards to those vehicles?

8           MR. KELLY:  Not as far as I know.  Again, if

9   First Republic Group entered into any leases for

10  office equipment or any other personal property, the

11  current ownership of First Republic Group is not

12  aware of that.

13          MR. KHODOROVSKY:  Let's go on.  Has the

14  company factored any of its accounts receivable?

15          MR. KELLY:  There are - - receivables from

16  the tenants that we will be discussing with Jones

17  Lang Lasalle.  As rent payments remain outstanding,

18  negotiations are had with tenants, that type of

19  thing.

20          MR. KHODOROVSKY:  But currently none.

21          MR. ROSEN:  Excuse me, let me interrupt.

22  The question was were any of the companies accounts

23  receivables factored meaning did you go to a factor

24  finance company and--

25          MR. KELLY:  [interposing]  Well, again, not

1    as far as--not as far as I know.

2            MR. ROSEN:  That was the intent of the

3    question, right, factored?

4            MR. KHODOROVSKY:  Yes, I mean if you--but if

5    you intend to factor any of them in the future,

6    please--

7            MR. KELLY:  [interposing]  I don't believe

8    so.  I don't believe so.

9            MR. KHODOROVSKY:  Does the company have any

10   secure creditors presently?

11           MR. KELLY:  Yes.

12           MR. KHODOROVSKY:  Who are the secured

13   creditors?

14           MR. KELLY:  Citigroup.

15           MR. KHODOROVSKY: And what assets of the

16   debtor are debtor are covered by Citigroup's liens?

17           MR. KELLY:  All eleven of the properties are

18   secured by a mortgage or mortgages.

19           MR. KHODOROVSKY:  What about personal

20   property?  Do these liens extend to the personal

21   property of the debtor, including receivables?

22           MR. ROSEN:  I think they're blanket liens on

23   substantially all of the assets including

24   receivables.

25           MR. KHODOROVSKY:  Has the debtor obtained a

1    cash collateral order from the court with regards to

2    the use of the assets for which its secured creditors

3    have a lien?

4              MR. KELLY:  Yes, temporary.

5              MR. KHODOROVSKY:  Since the bankruptcy

6    filing, what have been the total revenues of the

7    company?

8              MR. KELLY:  Since the bankruptcy filing?

9              MR. KHODOROVSKY:  Gross revenues.

10             MR. KELLY:  I understand.  It's probably--we

11   would have to check the bank statements or the lock

12   boxes.  My estimate is between a million and a half

13   and two million dollars in rents that have been

14   received.

15             MR. KHODOROVSKY:  So currently is the

16   company operating at a profit or a loss?

17             MR. KELLY:  Profit.

18             MR. KHODOROVSKY:  To the best of your

19   knowledge in 2008 did the company operate at a profit

20   or at a loss?

21             MR. KELLY:  A profit.

22             MR. KHODOROVSKY:  How much was its profit in

23   2008?  If you need to consult your notes, go ahead.

24             MR. KELLY:  No, I'm hesitating not because I

25   need to consult my notes.  The cash flow generated

1     from the property that I'm aware of after payment of

2     debt service was approximately $4 to $5 million.

3                MR. KHODOROVSKY:  Okay, has the--

4                MR. ROSEN:  [interposing]  Per year?

5                MR. KELLY:  For the year, and the reason I

6     hesitate is that there's a question on whether or not

7     all of the rents that were received were generated by

8     the properties, were run through the lock box

9     account.  So there may have been additional income

10    that I am not aware of.

11               MR. KHODOROVSKY:  Okay.  In 2007, to the

12    best of your knowledge did the company have a profit

13    or a loss, for the part of 2007 it operated?

14               MR. KELLY:  For the few months, I believe it

15    operated at approximately break even in 2007 again

16    after debt service.

17               MR. KHODOROVSKY:  Now, has the company filed

18    its 2008 tax returns?

19               MR. KELLY:  Not as far as I know.

20               MR. KHODOROVSKY:  What about 2007 tax

21    returns?

22               MR. KELLY:  I do not know.

23               MR. KHODOROVSKY:  Counsel, are you aware as

24    to whether 2008 or 2007 tax returns have been filed?

25               MR. ROSEN:  We are not aware, and we don't

1   know the identity of the company's former accountant,

2   but we will find out.

3          MR. KHODOROVSKY:  Okay, counsel, I would

4   like to request that since you don't know the answer

5   to the question.  Let me--let me put it this way.  If

6   the company will be filing any tax returns that have

7   not been filed in the past, I would like to get

8   copies of those returns when they're filed.

9          MR. ROSEN:  Sure.

10         MR. KHODOROVSKY:  Okay, now if there have

11  been tax returns filed in the past, please as you

12  locate them, please provide my office with copies.

13         MR. ROSEN:  We will do so.

14         MR. KHODOROVSKY:  Okay.  Let's move on.

15  Going forward the next six months, what do you expect

16  the company's revenues will be?

17         MR. KELLY:  Over the next six months, the

18  revenue should be approximately $8 to 10 million.

19         MR. KHODOROVSKY:  Total?

20         MR. KELLY:  Revenue.

21         MR. KHODOROVSKY:  So will the company have a

22  profit or a loss?

23         MR. KELLY:  As of now it's projected to have

24  a profit.

25         MR. KHODOROVSKY:  What's the basis for the

1       projection?

2                MR. KELLY:  Of the $10 million, out of the

3       $10 million expenses of approximately--operating

4       expenses of approximately $3.5 to $4 million will be

5       paid, real estate taxes totalling about a million and

6       a half dollars will be paid, debt service on the $111

7       million mortgage will be paid of another $3 to $4

8       million assuming that LIBOR stays where it is today.

9                MR. KHODOROVSKY:  Okay.

10               MR. KELLY:  If LIBOR spikes or increases

11      significantly, the company will not operate at a

12      profit because the interest rate on the mortgage will

13      increase.

14               MR. KHODOROVSKY:  I understand.

15               MR. KELLY:  Okay.

16               MR. KHODOROVSKY:  Now let's talk about the

17      properties.  Can you give me the addresses of the

18      properties?

19               MR. KELLY:  All 11 properties?

20               MR. KHODOROVSKY:  Yes.  Do you have them?

21               MR. ROSEN:  We have them.  I don't know if

22      we have them with us.

23               MR. KELLY:  I don't know if I have them with

24      me.

25               MALE VOICE:  You've got the management

1    agreement.  It's got copies.

2                MR. ROSEN:  We have a copy of the management

3    agreement.  We can give that to you, and I can also

4    provide that to you in writing.  That's going to be

5    part of what's going to be on the schedules as well.

6                MR. KHODOROVSKY:  I understand, but we

7    currently don't have schedules.

8                MR. ROSEN:  That's correct.

9                MR. KHODOROVSKY:  So in the absence of the

10   schedules, I'd like to find out at least the

11   addresses of the properties.

12               MR. KELLY:  I'll read them out to you.

13               MALE VOICE:  This is the management

14   agreement and the schedule - -.

15               MR. KELLY:  Okay, that's fine.

16               MR. KHODOROVSKY:  Are you ready?

17               MR. KELLY:  Sure.

18               MR. KHODOROVSKY:  Go ahead.

19               MR. KELLY:  Bell Road Shopping Center, 2701

20   to 2787 Bell Road, Montgomery, Alabama 36117.

21               MR. KHODOROVSKY:  B-l-l.

22               MR. KELLY:  B-e-l-l Road.

23               MR. KHODOROVSKY:  Okay, go ahead.

24               MR. KELLY:  Brit David Shopping Center.

25               MR. ROSEN:  Couldn't he just provide you a

1    list instead of you sitting here writing each one of

2    them?

3         MR. KHODOROVSKY:  That's possible, but I

4    mean unless creditors are interested in knowing where

5    the properties are.

6         MALE VOICE:  We know where the properties

7    are.

8         MR. KELLY:  We can get you a list.

9         MR. KHODOROVSKY:  Oh, you can get--okay, so

10   I would like to request by--okay, so I would like to

11   request a list by August 19th, is that possible?

12        MR. KELLY:  Sure.

13        MR. KHODOROVSKY:  A list of all the

14   properties with the addresses.  Again, the reason I'm

15   asking is because the pleading is currently with the

16   court.  I'm not sure they contain the list of

17   properties.

18        MR. ROSEN:  They don't.

19        MR. KHODOROVSKY:  Okay, now you've

20   previously spoken that there's a managing agent here

21   on the property, Jones Lang Lasalle.  Is that

22   correct?

23        MR. KELLY:  Yes.

24        MR. KHODOROVSKY:  Now, do you know what's

25   the managing agent's address?

1        MR. ROSEN:  It's also on the management

2   agreement.  I'll find it.  I might as well.  We're

3   looking through the Jones Lang Lasalle Management

4   Agreement, which attached to this has a list of all

5   the properties and - - noted.  There's actually two

6   addresses.  One for a notice, and one to the manager.

7        MR. KHODOROVSKY:  Whichever one you use on a

8   regular basis.

9        MR. ROSEN:  You want to--

10       MR. KELLY:  [interposing]  Yeah, that

11  Atlanta address is changing.

12       MR. KELLY:  We can give them that address.

13  I don't have the--

14       MR. ROSEN:  [interposing]  I can provide

15  that to you by the end of the day.

16       MR. KHODOROVSKY:  Okay, so if possible by

17  the end of the day if you could e-mail me the

18  address.

19       MR. ROSEN:  Sure, e-mail the address of

20  Jones Lang Lasalle.

21       MR. KHODOROVSKY:  Okay, now you've

22  previously spoken of that management agent charges

23  the company about $54,000 a month plus payroll

24  expenses?

25       MR. KELLY:  Yes.

1        MR. KHODOROVSKY:  Now, is--does--is Jones

2    Lang Lasalle in any way related to First Republic?

3    In other words, does it share any common ownership

4    with First Republic, common principles, insiders?

5        MR. KELLY:  No.

6        MR. ROSEN:  You're talking about the current

7    management of First Republic?

8        MR. KHODOROVSKY:  Both current or former if

9    you know, if you know of any connections.

10       MR. ROSEN:  Do you know of any connection

11   between the former management?

12       ROBERT LEE:  This is Robert Lee and - - for

13   Jones Lang Lasalle Americas.  I know of no

14   connections, ownership or otherwise, between Jones

15   Lang Lasalle Americas, and First Republic Group.

16       MR. KHODOROVSKY:  Okay.  As part of the

17   reorganization of the company, is the company

18   contemplating selling the business or substantially

19   all of its assets?

20       MR. KELLY:  We are considering it, yes.

21       MR. KHODOROVSKY:  Please answer the next

22   questions, the next set of questions to the best of

23   your ability.  If you don't know or if it's

24   confidential, let me know.  Outside of the ordinary

25   course of business, were any of the company's assets

1   transferred to any other businesses or persons during

2   the year before the bankruptcy filling?

3           MR. KELLY:  I do not know.

4           MR. KHODOROVSKY:  Since the company filed

5   for bankruptcy have any debts of the company, have

6   any pre-petition debts of the company been paid?  In

7   other words, if the company had a pre-petition debt,

8   have any of them been paid after the bankruptcy

9   filing?

10          MR. KELLY:  I don't believe so.

11          MR. KHODOROVSKY:  With regards to both

12  current and former management, have any of the

13  officers, directors, equity holders or partners of

14  the company made any loans to it?

15          MR. KELLY:  Not as far as I know.

16          MR. KHODOROVSKY:  Okay, let me flip the

17  question.  During--has the company itself ever made

18  loans to anybody including employees, officers,

19  directors, shareholders, equity holders, partners?

20          MR. KELLY:  I do not know.

21          MR. KHODOROVSKY:  Have any of the company's

22  officers, directors, shareholders, equity holders or

23  partners, made capital contributions to the company?

24          MR. KELLY:  Again, I do not know given our

25  limited period of ownership.  I can't say what

1    happened prior to that.

2           MR. KHODOROVSKY:  Has the company ever

3    repaid any personal loans on behalf of its employees,

4    including shareholders, equity holders, officers, or

5    directors?

6           MR. KELLY:  The same answer unfortunately.

7    I don't know.

8           MR. KHODOROVSKY:  You have previously spoken

9    about that the company has a--had a subsidiary or a

10   parent entity, FRGR.

11          MR. KELLY:  Yes.

12          MR. KHODOROVSKY:  With regards to FRGR, has

13   the company, by company I mean First Republic Group

14   Realty has it ever lent money to FRGR?

15          MR. KELLY:  I do not know.

16          MR. KHODOROVSKY:  Has the debtor ever

17   borrowed any money from FFRGR?

18          MR. KELLY:  Again, I don't know.

19          MR. KHODOROVSKY:  Has the debtor ever paid

20   for any expenses associated with running FFRGR?  If

21   you don't know--

22          MR. KELLY:  [interposing]  I don't know.

23          MR. KHODOROVSKY:  Now with regards to the

24   current ownership of the company, mainly with regards

25   to the current 100% equity holder, Commercial

1    Liquidation Properties One, LLC, has the debtor ever

2    lent any money to Commercial Properties One?

3              MR. KELLY:  No.

4              MR. KHODOROVSKY:  Has the debtor ever

5    borrowed any money from Commercial Properties One,

6    LLC?

7              MR. KELLY:  No.

8              MR. KHODOROVSKY:  Has the debtor ever paid

9    for any expenses associated with running Commercial

10   Properties Liquidation One LLC?

11             MR. KELLY:  No.

12             MR. KHODOROVSKY:  Before the company filed

13   for bankruptcy, has the company paid any bonuses,

14   dividends or special fees to anybody?

15             MR. KELLY:  I do not know.

16             MR. KHODOROVSKY:  Currently is the company

17   subject to any audits or investigations by any

18   government entities?

19             MR. ROSEN:  To the best of your knowledge?

20             MR. KHODOROVSKY:  Anything from a State

21   Sanitation Department to an IRS audit?

22             MR. KELLY:  I do not know.

23             MR. KHODOROVSKY:  Mr. Kelly, presently are

24   you personally subject to any audits pending - -

25   investigations by any government entities?

1        MR. KELLY:  No.

2        MR. KHODOROVSKY:  In the last five years,

3   has the company been subject to any audits or

4   investigations by any government entities?

5        MR. KELLY:  I don't know.

6        MR. KHODOROVSKY:  Have you yourself been

7   personally subject to any audits or investigations by

8   any government entities in the last five years?

9        MR. KELLY:  No.

10       MR. KHODOROVSKY:  Is the company currently a

11  plaintiff or a defendant in any currently pending

12  litigation?

13       MR. KELLY:  Yes.

14       MR. KHODOROVSKY:  Can you please describe

15  any currently pending litigation in which the company

16  is involved?  You don't need to lay out the basis for

17  it. Just tell me what lawsuits are pending where,

18  state or federal court, things like that?

19       MR. ROSEN:  Do you want me to give it a

20  shot?  There are two pending actions.  One is an

21  action regarding Amusement Industry Inc. in federal

22  district court, southern district of New York.  I

23  believe the company is the defendant in that action.

24  And there's another action in New York State Supreme

25  Court involving also Amusement Industry Inc., and the

1     company another other parties.  Both are pending.

2          MR. KHODOROVSKY:  And the other litigation

3     in state court is the debtor a plaintiff or

4     defendant?

5          MR. ROSEN:  State court, maybe the state

6     court might be just--might be Amusement Industry Inc.

7     versus Citigroup.

8          MR. KHODOROVSKY:  But what is the debtor's

9     role, not Citigroup's role?  Is the debtor a

10    plaintiff or defendant?

11         MR. ROSEN:  I'm not sure the debtor is a

12    party.

13         MR. KELLY:  I think the debtor is a

14    plaintiff in that.

15         MR. ROSEN:  The debtor is a plaintiff in

16    that, and Citigroup is the defendant, but that list

17    of litigation will be provided on the schedules

18    obviously.

19         MR. KHODOROVSKY:  I understand.

20         MALE VOICE:  To the extent there is slip and

21    falls and minor collections - - we'll provide that

22    list.

23         MR. ROSEN: Yeah, there may be a lot of other

24    litigation running--

25         MALE VOICE:  [interposing]  That Lang

1    Lasalle may be handling.

2            MR. KELLY:  Regarding the properties that

3    Jones Lang Lasalle will have.

4            MR. KHODOROVSKY:  Okay, now briefly can you

5    describe why the debtor filed for bankruptcy?

6            MR. ROSEN:  Well, to qualify he's already

7    testified that he didn't sign the petition.  He

8    wasn't an officer at the time and he didn't make the

9    decision to file bankruptcy.

10           MR. KHODOROVSKY:  But to the best of your

11   knowledge.

12           MR. ROSEN:  Why the former officers decided

13   to do it?

14           MR. KHODOROVSKY:  Well, why the company

15   filed.  I'm not asking you, sir, to get into the mind

16   of Mr. Stern.  To the best of your knowledge, what

17   forced the company to go into a chapter 11?  Was

18   there a foreclosure of any kind?

19           MR. KELLY:  It was the pending foreclosure

20   of the Mezzanine entity.

21           MR. KHODOROVSKY:  Okay.

22           MR. ROSEN:  Yeah.

23           MR. KHODOROVSKY:  Now, let's look forward.

24   So, in order to emerge successfully from Chapter 11

25   what would the company need to do?

1     MR. KELLY:  We are still working through

2  what the company consists of, what it owns, what it

3  owes, so it's hard to say at this point what the

4  company would need to do to emerge successfully.

5     MR. KHODOROVSKY:  How long do you think that

6  investigation would take, six months, nine months,

7  twelve months, two years?

8     MR. KELLY:  We are hoping to have a plan in

9  place within the next 60 days.

10     MR. KHODOROVSKY:  A plan of reorganization?

11     MR. KELLY:  That would allow the company to

12  emerge from the bankruptcy by the end of the year.

13     MR. ROSEN:  The interim cash collateral

14  order, this is Adam Rosen again.  The interim cash

15  collateral order requires that a plan be filed by

16  September 30th, 2009.  That's not to say we may not

17  ask to extend that period,  but right now that's

18  what's in the order.

19     MR. KHODOROVSKY:  I understand.  Will the

20  company--in order to reorganize will the company then

21  need additional funding?

22     MR. KELLY:  As long as LIBOR stays where it

23  is, the company should not need any additional

24  financing.

25     MR. KHODOROVSKY:  Will the company need to

1    hire any additional staff as part of any

2    reorganization?

3          MR. KELLY: I don't believe so outside of

4    the accountants we mentioned earlier.

5          MR. KHODOROVSKY: Will the management of the

6    company change at all as the case is going forward?

7    Are there any anticipated changes in management?

8          MR. KELLY: None at this time.

9          MR. KHODOROVSKY: Now, you previously

10    referred to the fact that the company will be

11    retaining accountants. Are there any other

12    professionals the company would need to retain, like

13    financial advisors, special counsel, things like

14    that?

15          MR. KELLY: We may retain a real estate

16    broker to market the assets for us as part of the

17    sale if that's a path that we choose to go down.

18          MR. KHODOROVSKY: Okay. I'm almost done

19    with my questions. Let me--before I finish up I'd

20    like to briefly go through with you certain

21    administrative requirements that are necessary as

22    part of being in Chapter 11. One of the

23    administrative requirements, I don't know if your

24    counsel has discussed it with you, Mr. Kelly, but is

25    to file monthly operating reports. And what I wanted

1    to give you right now, this is from my office's web

2    site.  And it's available on my office's web site as

3    an Exel form.  This is a monthly operating report.

4                    MR. KELLY:  Okay.

5                    MR. KHODOROVSKY:  It's fillable as an Excel

6    form.  You can download it and fill it out.  It needs

7    to be signed and filed with the Court.

8                    MR. KELLY:  Okay.

9                    MR. KHODOROVSKY:  These monthly operating

10   reports must be filed promptly each and every month

11   while the company is in Chapter 11 regardless of

12   whether it is operating or not.  These monthly

13   operating reports must comply with the U.S. Trustee

14   Guidelines, and the form that you have, the blank

15   form that you have complies with U.S. Trustee

16   guidelines and needs to be filled out.  And bank

17   statements need to be attached.

18                    The next administrative requirement

19   necessary for this case to go on is the payment of

20   quarterly fees.  These - - quarterly fees that are

21   due each and every quarter that the company is in

22   Chapter 11.  So, the company filed for Chapter 11 in

23   the second quarter of 2009, and we are currently in

24   the third quarter.  So, the quarterly fee payments

25   for second quarter were due on the 31st of July and

1    the company currently owes $650 in estimated U.S.

2    Trustee quarterly fees.

3            MR. KELLY:  - - .

4            MR. KHODOROVSKY:  Well, that's--again, the

5    amount is an estimate.  The estimate is subject to a

6    revision.  When the company will submit monthly

7    operating reports, those will contain disbursements,

8    and we will use those disbursements to determine what

9    the quarterly fees are.  That's why what you're

10   seeing now is purely an estimate.  As we get

11   different figures, the estimates may change.  Okay,

12   now additionally if the company is delinquent in

13   paying quarterly fees, under 31 USC Section 3717,

14   interest will be assessed on all past due chapter 11

15   quarterly fees.  Do you understand these

16   requirements?

17           MR. KELLY:  I do.  Can I ask a question?

18           MR. KHODOROVSKY:  Go ahead.

19           MR. KELLY:  If it's going to take us another

20   couple of weeks to submit the report, can we pay the

21   estimated fee now?

22           MR. KHODOROVSKY:  You can pay the estimated

23   fees now, and then if the amount were proved to be

24   lower, it would be adjusted to a credit balance.

25           MR. KELLY:  Okay.

1    MR. ROSEN:  Okay, we'll do that.

2    MR. KHODOROVSKY: Do you understand these

3    requirements, both of you?

4    MR. KELLY:  I do.

5    MR. ROSEN:  I do.

6    MR. KHODOROVSKY:  One thing I have to

7    explain to you is that if the company consistently

8    fails to file operating reports timely or

9    consistently fails to pay quarterly fees timely, this

10   may cause the United States Trustees Office to seek

11   to dismiss this case or to convert this to a Chapter

12   7 liquidation case.  Do you understand that?

13   MR. KELLY:  I do.  I have one other

14   question.

15   MR. KHODOROVSKY:  Go ahead.

16   MR. KELLY:  Given the lack of access to pre-

17   petition operating information for the company, are

18   we permitted to submit this monthly operating report

19   based on what we know with the caveat that we still

20   would not have all the information from the company?

21   MR. KHODOROVSKY:  Well, the op report is

22   supposed to cover periods after the bankruptcy

23   filing.

24   MR. KELLY:  Okay, that's fine.

25   MR. KHODOROVSKY:  So, if that--now, if

1   filing a post, filing your report covering your post-

2   bankruptcy period requires you to obtain pre-

3   bankruptcy information and you're having difficulty

4   and you can't fill something out because of that,

5   please give me a call.

6           MR. KELLY:  Okay.

7           MR. KHODOROVSKY:  And your counsel can give

8   me a call, and we can go over it if there's an issue

9   that you can't fill something out for a post-

10  bankruptcy period.

11          MR. KELLY:  Okay.

12          MR. KHODOROVSKY:  Now, before I turn the

13  floor over to creditors, I just want to briefly

14  summarize all of the information that I have

15  requested with the deadlines for providing it.  Okay,

16  here's the information I requested on the deadlines.

17  By August 19th I wanted to ask to obtain a list of all

18  the bank accounts and their addresses.  Also by

19  august 19th I want to get a copy of all of the

20  insurance certificates.  Also by letter on August

21  19th, information if there's been any changes in stock

22  ownership in the company since founding other than

23  the foreclosure.  Also, by August 19th I requested

24  information with regards to fire code or municipal

25  code violations on the properties.  Also I had

1    requested copies of the tax returns when filed or

2    when found.  Also, by August 19th in writing I'd like

3    to get a list with addresses of all the properties.

4                MR. ROSEN:  Also the address of Jones Lang

5    Lasalle.

6                MR. KHODOROVSKY:  Yes, exactly, the address

7    of Jones Lang Lasalle.

8                MR. ROSEN:  Can I give that to you by

9    tomorrow since it's already--

10               MR. KHODOROVSKY:  [interposing]  That is

11   fine.

12               MR. ROSEN:  Is that okay?

13               MR. KHODOROVSKY:  That is absolutely fine.

14   Even if I get it by August 19th, it's also fine.

15               MR. ROSEN:  I'll get it to you before then.

16               MR. KHODOROVSKY:  Okay, excellent, and to

17   the extent you can provide any of the information

18   that I requested sooner, provide it to me sooner, but

19   August 19th is currently the deadline.  So, let me do

20   this.  I'm going to--the United States Trustee has

21   completed questions of this debtor at the present

22   time.  Are there any creditors present here who have

23   questions?  Creditors?  Any creditors have any

24   questions here?  Okay.

25               MR. ROSEN:  Is there going to be an

1  adjourned hearing?

2  MR. KHODOROVSKY: Here's what I'd like to do

3  because we don't have schedules. What I'd like to do

4  is I'm going to adjourn this for a couple of months

5  to see if schedules come in, if a committee is

6  appointed, and then I'll make a determination if this

7  needs to be closed. Here's what I'm going to do.

8  Today is the 5th of August. So let's go forward a

9  couple of months to two months from today to a

10  Wednesday. We're going to put it for a holding date

11  of Wednesday, October 7th, 2009, at 2:30 p.m. Again,

12  it's a holding date. Mr. Kelly, here is what I mean

13  by a holding date. A hold date means you do not have

14  to come unless my office gets in touch with counsel

15  and tells that--tells you that--tells counsel you

16  have to come. Creditors, if you would like to ask

17  questions on October 7th, if you would like the

18  meeting on October 7th to be held, please let me know

19  in advance so I can get in touch with counsel and

20  tell counsel to make sure that Mr. Kelly comes by to

21  answer any questions. Okay, so before I close for

22  today, again, creditors, do any creditors have

23  questions they would like to ask right now of Mr.

24  Kelly? No? Okay, hearing silence, we are off the

25  record. Today is August 5th, 2009. The time is 3:26

1        p.m.

2        [OFF THE RECORD]

3                    [END OF HEARING]

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

## C E R T I F I C A T E

I, Trisha Ruckart, certify that the foregoing transcript
of proceedings in the U.S. Trustee Office, Chapter 11,
First Republic Group Realty, LLC, Case Number 09-13983 was
prepared using the required transcription equipment and is
a true and accurate record of the proceedings.


Signature:     Trisha Ruckart

Date:     September 4, 2009

# Exhibit B

# RESTRICTED USE APPRAISAL REPORT

OF

## PORTFOLIO CONSISTING OF 11 RETAIL MALLS



**DATES OF VALUATION**

"Retrospective" Value: DECEMBER 31, 2008

**PREPARED FOR**
**MR. MARK STERN**
**C/O FRGR MANAGING MEMBER, LLC**
**489 FIFTH AVENUE – 28TH FLOOR**
**NEW YORK, NY 10017**

**PREPARED BY**
**U.S. REAL ESTATE ADVISORS, INC**
**75 WOODLAND PARK DRIVE**
**TENAFLY, NJ  07670**

October 15, 2009

Mr. Mark Stern
C/O FRGR Managing Member, LLC
489 Fifth Avenue – 28th Floor
New York, NY 10017

Re:    **<u>Restricted Use Appraisal Report</u>**
        (Portfolio consisting of 11 Retail Malls -
        Multiple Locations)


Dear Mr. Stern,

In accordance with your request, we have inspected the above referenced property and have completed a Restricted Use Appraisal Report which provides a brief statement of the reasoning employed in arriving at the value estimate.

The purpose of this report is to estimate the "Retrospective" value as of December 31, 2008 of the Leased Fee interest in the property consisting of 11 Retail Malls.  There is approximately 2,427,330 SF of rentable space and the vacancy rate as of YE2008 was estimated to be 20.1% and the projected vacancy rate for 2009 was estimated to be approximately 23%.  Therefore, no consideration or addition to value was given for any leasing activity (or Letters of Intent) that would have increased the Portfolio value, except for the two Carmike leases (one in Decatur, Al and one in Staunton, VA) - which in 2008 were in the process of being executed. See comment in the Hypothetical Assumptions section of this report and note that the additional Hypothetical Value from these two leases were not included or added into our final reconciled value.

Our analysis is based primarily on interviews with the borrower and local real estate brokers; research of actual/asking sales prices of comparable properties, rent rolls, lease abstracts (where available), as well as our knowledge of the local market. The analysis, opinions, and conclusions were prepared by the undersigned.  Basic assumptions and limiting conditions of the valuation are detailed in the attached report.

Due to the substantial increase in volatility in the capital markets, significant uncertainty has been created in the real property marketplace.  It is difficult to predict what may happen in the capital markets going forward - as there has been a significant slowdown in recent sales and the ability of buyers to obtain financing.  As a result, it is difficult to predict in our appraisal analysis what may happen to real property values over time.

Therefore, we utilized the best information in our valuation that was available at the time of our analysis.  Given the on-going volatility in the marketplace, users of this appraisal should consider the current market uncertainty and the level of confidence they choose to place on these analyses and conclusions.  All clients and users are reminded that the appraisal conclusions in this report are effective as of the date of value stated herein.

Mark Stern of FRGR Managing Member, LLC is the user recipient of this report and is a frequent user of appraisal reports, has knowledge of the appraisal terms used in this report and is very familiar with valuation concepts and principles.  Any unintended readers of this report are advised to seek additional help in understanding the appraisal, and should not rely on or draw conclusions from any item in the report.

The Income Capitalization Approach was used for the valuation of the subject property.  The Sales Comparison Approach was not used for this analysis since the portfolio was unique. The Cost Approach was not utilized to value the subject property since it is difficult to estimate the accrued depreciation, and participants in the market for the subject property rely most heavily on the Income Capitalization Approach.

**Conclusion: "Retrospective" Value**

We estimate the "Retrospective" market value of the Leased Fee interest in the subject properties, as of December 31, 2008 at:

**ONE HUNDRED THIRTY SEVEN MILLION DOLLARS**
**$137,000,000**

**Conclusion: "Retrospective" Value with $8.0 Million in Escrow deposits held with Citigroup:**

In addition to the retrospective real estate value, the client has requested that we indicate the addition of $8.0 Million in escrow payments reportedly being held by Citigroup in various escrows due to ongoing litigation. Assuming that the escrow money has no liens against it and is given to a potential buyer at closing, the total would "hypothetically" be $145,000,000, as shown below.

| | |
|---|---|
| Real Estate Value | $137,000,000 |
| Cash in Escrow account | $8,000,000 |
| **Total Real Estate & Escrow Deposits** | **$145,000,000** |

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS:

- Valued as a Portfolio utilizing the consolidated financial statements from Jones Lang LaSalle since this transaction was a purchase of 11 property Portfolio upon which the loan was based.

- Individual allocated values for the Colonial Portfolio were based on prior appraisals completed by Integra Realty Resources for the benefit of CitiGroup, dated May-June, 2007 and were reduced from a value of approximately $193,000,000 to reflect market conditions as of 12/31/08. These values are shown for informational purposes only in the Conclusion section of this report.

- As of 12/31/2008, the properties were assumed to continue to be maintained in good condition.

- Borrower has provided a copy of an offer of $137,300,000 presented on November 7, 2008, however the sale was not consummated.

- Borrower has also provided an additional Letter of Intent from a potential buyer, dated April 6, 2008 for $142,150,000 which also was not consummated.

- CitiGroup is holding $8.0 million from the subject properties in various escrows due to an ongoing litigation.

- Financial information provided by the borrower for the month of April 2009 is an accurate reflection for the year 2009 estimate.

- Assumed (as per the borrower) that a hypothetical condition that a new tenant, Carmike, (whose lease was in the process of being executed in 2008) would have occupied 42,000 SF of space in both the Decatur and Staunton malls to have commenced in 2009, and would have resulted in an increase in the combined portfolio value by $14,100,000 after incurring costs of approximately $8,000,000.

- However, (as per the borrower), an additional hypothetical condition regarding the $8,000,000 in costs is that Decatur Township would have reimbursed $4,400,000 of the expected development cost and Staunton Township would have reimbursed $2,500,000 of the improvement costs.

We would be pleased to respond to any questions concerning this report and any information used as the basis for the conclusions offered.  It has been a pleasure to be of service to you in preparing the enclosed report.

Respectfully submitted,

**US REAL ESTATE ADVISORS, INC.**

_Steven B. Wolgin_

Steve Wolgin, MAI, CRE

Attachment

| IDENTIFICATION OF THE PROBLEM TO BE SOLVED | |
|---|---|
| **Client/intended user:** | For the sole use of Mr. Mark Stern of FRGR Managing Member, LLC |
| **Intended use:** | To assist the client in establishing a price at which to refinance the property.  This report is not intended for any other use.  The appraiser is not responsible for unauthorized use of this report. |
| **Objective of the Assignment:** | To develop an opinion of the Retrospective Value of the stated interest in the subject property.  "Market value" is defined by the agencies that regulate financial institutions in the United States and is published by the Appraisal Institute in the Dictionary of Real Estate Appraisal, 4th edition. |
| **Effective date of value opinion:** | December 31, 2008 |
| **Real property interest valued:** | Leased Fee |
| **Identification of real estate:** | Multiple Locations in Alabama, Virginia, Georgia and North Carolina |
| **Current use:** | Retail |
| **Highest and best use:** | Retail |
| **Conditions of the Assignment:** | |
| **Extraordinary Assumptions:** | <ul><li>We valued the subject property as a Portfolio utilizing the consolidated financial statements from Jones Lang LaSalle since this transaction was a Portfolio purchase of 11 properties upon which the loan was based.</li><li>Allocated values for the Colonial Portfolio were based on prior appraisals completed by Integra Realty Resources for the benefit of Citigroup, dated May-June, 2007 and were reduced from a value of approximately $193,000,000 to reflect market conditions as of 12/31/08. These values are shown for informational purposes only in the Conclusion section of this report.</li><li>As of 12/31/2008, the properties were assumed to be maintained in good condition.</li><li>Borrower has provided a copy of an offer of $137,300,000 presented on November 7, 2008, however the sale was not consummated.</li><li>The Borrower has also provided a Letter of Intent to purchase the property, dated April 6, 2008 for</li></ul> |

| | |
|---|---|
| | $142,150,000, which also was not consummated.<br>• Reportedly Citigroup is currently holding $8.0 million from the subject properties in various escrows due to an ongoing litigation.<br>• Financial information provided by the borrower for the month of April 2009 is an accurate reflection for year 2009 estimate. |
| **Hypothetical Conditions:** | • There is a hypothetical condition that a new tenant, Carmike, whose lease was in the process of being executed in 2008, would have occupied 42,000 SF of space in both Decatur and Staunton to have commenced in 2009 would have resulted in an increase in the combined portfolio value of **$14,100,000**.<br>• There is an additional hypothetical condition regarding the $8,000,000 in costs: Decatur Township would have reimbursed $4,400,000 of the expected development cost and Staunton Township would have reimbursed $2,500,000 of the improvement costs. |
| **Date of report:** | October 15, 2009 |
| | |

**List of Properties**

Colonial Shoppes Bellwood
2701-2787 Bell Road
Montgomery, Alabama 36117

Britt David Shopping Center
2911 Airport Thruway
Columbus, Georgia 31906

Colonial Mall Lakeshore
150 Pearl Nix Parkway
Gainesville, Georgia 30501

Colonial Mall Decatur
1801 Beltline Road SW
Decatur, Alabama 35601

Colonial Promenade Montgomery
2542-2786 Eastern Boulevard
Montgomery, Alabama 36117

Colonial Mall – Staunton
90 Lee-Jackson Highway
Staunton, Virginia 24401

Mayberry Mall
Andy Griffith Parkway
Mount Airy, North Carolina 27030

McGehee
3459 McGehee Road
Montgomery, Alabama 36111

Old Towne Shopping Square
3003-3009 McGehee Road
Montgomery, Alabama 36111

Promenade Montgomery North
2232-2430 Eastern Boulevard
Montgomery, Alabama 36117

Quaker Village
5606 West Friendly Avenue
Greensboro, North Carolina 27410

| **SCOPE OF WORK** | |
|---|---|
| **Scope of Work:** | In preparing this appraisal, the appraiser<br><br>• Analyzed the information provided by the owner such as the previous appraisal and rent roll and occupancy.<br>• In the income approach, the appraiser used the direct capitalization approach.<br>• Developed a range of Cap Rates for properties in the range of 7% to 9.25% based on multiple factors. |
| **Report Option:** | This report is a Restricted Appraisal Report in accordance with Standards Rule 2-2(c) of the Uniform Standards of Professional Appraisal Practice.  As such, it does not present detailed discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value.  Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's work file.  The appraiser's opinions and conclusions set forth in this report cannot be understood properly without additional information in the appraiser's work file. |

**CONCLUSION OF ANALYSIS**
*Based on the above cited scope of work, as of the effective date noted,*
*and subject to the extraordinary assumptions and hypothetical conditions listed.*

**Opinion of Value:**
**(Retrospective Value)**

### Retrospective Value as of December 31, 2008

| | | |
|---|---|---|
| 1 | 1. Colonial Shoppes- Bellwood, AL | $4,475,000 |
| 2 | 2. Colonial Mall- Decatur, AL | $30,500,000 |
| 3 | 3. Britt David Shopping Center, GA | $7,425,000 |
| 4 | 4. Colonial Mall Lakeshore, GA | $25,300,000 |
| 5 | 5. Colonial Promenade Montgomery, AL | $17,675,000 |
| 6 | 6. Colonial Mall- Staunton, VA | $19,475,000 |
| 7 | 7. Mayberry Mall, NC | $4,800,000 |
| 8 | 8. Old Towne Shopping Center, AL | $375,000 |
| 9 | 9. Colonial Shoppes McGhee, AL | $3,075,000 |
| 10 | 10. Promenade Montgomery North, AL | $15,175,000 |
| 11 | 11. Quacker Village, AL | $8,625,000 |
| | Total Value | **$136,900,000** |
| | Rounded | $137,000,000 |

$137,000,000 (Rounded) (as of December 31, 2008)

**Property History:** This price is consistent with the appraiser's opinion of market value. There have been no other recorded transfers of the subject property in the three years prior to the effective date of this valuation.

# UNDERLYING ASSUMPTIONS

This appraisal report is subject to the following general assumptions and limiting conditions:

1. No investigation has been made of, and no responsibility is assumed for, the legal description or for legal matters including title or encumbrances. Title to the property is assumed to be good and marketable unless otherwise stated. The property is further assumed to be free and clear of liens, easements, encroachments and other encumbrances unless otherwise stated, and all improvements are assumed to lie within property boundaries.

2. Information furnished by others, upon which all or portions of this report are based, is believed to be reliable, but has not been verified in all cases. No warranty is given as to the accuracy of such information.

3. It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been, or can readily be obtained, or renewed for any use on which the value estimates provided in this report are based.

4. Full compliance with all applicable federal, state and local zoning, use occupancy, environmental, and similar laws and regulations is assumed, unless otherwise stated.

5. No responsibility is taken for changes in market conditions and no obligations assumed to revise this report to reflect events or conditions which occur subsequent to the appraisal date hereof.

6. Responsible ownership and competent property management are assumed.

7. The allocation, if any, in this report of the total valuation among components of the property applies only to the program of utilization stated in this report. The separate values for any components may not be applicable for any other purpose and must not be used in conjunction with any other appraisal.

8. Areas and dimensions of the property were obtained from sources believed to be reliable. Maps or sketches, if included in this report, are only to assist the reader in visualizing the property and no responsibility is assumed for their accuracy. No independent surveys were conducted.

9. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that affect value. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

10. No soil analysis or geological studies were ordered or made in conjunction with this report, nor was an investigation made of any water, oil, gas, coal, or other subsurface mineral and use rights or conditions.

11. Neither U.S. Real Estate Advisors, Inc., nor any individuals signing or associated with this report shall be required by reason of this report to give further consultation, to provide testimony or appear in court or other legal proceedings, unless specific arrangements therefore have been made.

12. This appraisal has been made in conformance with, and is subject to, the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice.

13. This report has been made only for the purpose stated and shall not be used for any other purpose. Neither this report nor any portions thereof (including without limitation any conclusions as to value, the identity of U.S. Real Estate Advisors, Inc., or any individuals signing or associated with this report, or the professional associations or organizations with which they are affiliated) shall be disseminated to third parties by any means without the prior written consent and approval of U.S. Real Estate Advisors, Inc.

14. We have not been engaged nor are qualified to detect the existence of hazardous material that may or may not be present on or near the property. The presence of potentially hazardous substances such as asbestos, urea-formaldehyde foam insulation, industrial wastes, etc. may affect the value of the property. The value estimate herein is predicated on the assumption that there is no such material on, in, or near the property that would cause a loss in value. No responsibility is assumed for any such conditions or for any expertise or engineering knowledge required to discover them. The client should retain an expert in this field if further information is desired.

15. The date of value to which the conclusions and opinions expressed in this report apply is set forth in the opinion letter at the front of this report. Our value opinion is based on the purchasing power of the United States' dollar as of this date.

16. This appraisal report cannot be included, or referred to, in any Securities and Exchange Commission filings or other public documents.

17. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the

property.  Since we have no evidence relating to this issue, we did not consider possible noncompliance with the requirements of the ADA in estimation the value of the property.

# LIMITING CONDITIONS

This appraisal report was prepared in accordance with the following limiting conditions. It is to be understood that a client's request for, and acceptance of, this appraisal report constitutes the acceptance of these limiting conditions.

♦ The appraiser will not be required to give testimony or appear in court as a result of preparing the appraisal with reference to the subject property in question, unless prior arrangements have been made and agreed upon to that effect.

♦ Possession of this report does not carry with it the right of publication. Out-of-context quotations or partial reprinting of this appraisal report is not authorized. Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of media for public communication without the prior written consent of the appraiser signing this appraisal report.

♦ Disclosure of the contents of this report is governed by the By-Laws and Regulations of The Appraisal Institute. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or appraisers or the firm with which the appraiser (s) is associated, or any reference to The Appraisal Institute or to the appraiser's designations) shall be disseminated to the public through advertising media, public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the respective appraiser or appraisers.

♦ The distribution of the total valuation in this report, between land and improvements, is applicable only as it is utilized in this appraisal. The land value, or the separate value of the improvements, must not be used in conjunction with any other appraisal or estimate and is invalid if so used.

♦ An appraisal related to an estate in land that is less than the whole Fee Simple Estate applies only to the fractional interest or interests involved. The value of this fractional interest plus the value of all other fractional interests may or may not equal the value of the entire Fee Simple Estate considered as a whole.

♦ The appraisal report related to a geographical portion of a larger parcel is applied only to such geographical portion and should not be considered as applying with equal validity to other portions of the larger parcel or tract as a whole. The value for such geographical portions plus the value of all other geographical portions may or may not equal the value of the entire parcel or tract considered as a whole.

♦ The forecasts, projections, or operating estimates contained herein are based upon current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to change as conditions change.

♦ The plans, specifications, and representations referred to herein are an integral part of the appraisal report when new construction, additions, renovations, or remodeling is either evident or proposed. As such the appraisal is subject to any proposed improvements or additions being completed as set forth in the plans, specifications, and representations referred to in the report, and all work being performed in a good and workmanlike manner. The appraisal is further subject to the proposed improvements or additions being constructed in accordance with the regulations of the local, county, and state authorities.

♦ No environmental or concurrency impact studies were either requested or made in conjunction with this appraisal report. The appraiser, thereby, reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental or concurrency impact studies, research or investigation subsequent to the completion of this appraisal report.

♦ The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The appraiser has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the subject property. Since the appraiser is not considered an expert with these issues, possible noncompliance with the requirements of ADA and its impact on the value of the subject property has not been considered.

♦ This appraisal report complies with the requirements set forth in title XI CFR part 225.61 et seq; of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, commonly known as "FIRREA". The appraisal also conforms to the Uniform Standards of Professional Appraisal Practice ("USPAP") and discloses any steps taken that were necessary or appropriate to comply with the competency provision of USPAP, and that this appraisal is not based on a requested minimum valuation, a specific valuation or the approval of a loan.

♦ U.S. Real Estate Advisors, Inc. maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence or otherwise) shall be limited to the fees paid to U.S. Real Estate Advisors, Inc. for its services under this individual assignment. In no event shall U.S. Real Estate Advisors, Inc. be liable for consequential, special, incidental or punitive loss, damage or expense (including without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

♦ If any provision of these terms or any document incorporated by reference is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of such documents remain in full force and effect.

♦ This document may be executed in counterpart, which when taken together shall constitute a single document.

♦ A facsimile (fax) signature shall be valid and binding.

♦ Client shall indemnify and hold U.S. Real Estate Advisors, Inc. and its personnel from and against any claims, liabilities, costs and expenses (including, without limitation, attorney's fees and the time of U.S. Real Estate Advisors, Inc. personnel involved and consequential, special incidental or punitive damages) brought against, paid or incurred by U.S. Real Estate Advisors, Inc. at any time and in any way arising out of a breach by client of its obligations under this agreement.

# CERTIFICATION

The Appraiser has personally conducted this appraisal in an objective manner. Furthermore, this appraisal conforms to "USPAP" Standards Rule 2-3 which states:

**We certify that, to the best of our knowledge and belief:**

- The statements of fact contained in this appraisal report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result or the occurrence of a subsequent event directly related to the intended use of this appraisal

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP).

- Steve Wolgin, MAI, CRE has not made a personal inspection of the property that is the subject of this report.

- We certify that, to the best of our knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- No one other than the individuals signing the report has provided significant professional assistance.

- Use of the report is subject to the professional requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, we have completed the continuing education program of the Appraisal Institute.

*Steven B. Wolgin*

Steve Wolgin, MAI, CRE

# ADDENDA

A. Additional Photographs of Subject (Provided by the Owner)
B. Appraisers' Qualifications

# Addenda A: ADDITIONAL PHOTOGRAPHS OF SUBJECT

## ADDENDA A: SUBJECT PHOTOS



**Decatur Mall**



## ADDENDA A: SUBJECT PHOTOS



**Colonial Mall Decatur**



**Colonial Mall Lakeshore**

# ADDENDA A: SUBJECT PHOTOS





**Promenade Montgomery North**

## ADDENDA A: SUBJECT PHOTOS



**Colonial Promenade Montgomery North**



**Old Towne Shopping Square**



**Quaker Village**



**Colonial Mall Staunton**

# Addenda B: APPRAISER'S QUALIFICATIONS

# US Real Estate Advisors, INC.
## STEVEN B.  WOLGIN, MAI, CRE

100 Park Avenue, Suite 2501, New York, NY 10017
212-922-9233 swolgin@optonline.net

## SUMMARY

Extensive experience involving writing appraisal reports, appraisal reviews, arbitration and litigation support. Assignments have involved complex appraisals for major office and retail properties and underwriting for new loans and re-financings, acquisitions, litigation and feasibility analysis. This experience has involved working with major banks, insurance companies, pension funds and developers nationwide for over the past 25 years.

## EXPERIENCE

**U.S. Real Estate Advisors, Inc.**                    **President (12/00 – Present)**
New York, New York
Provide appraisals, appraisal review, consulting and arbitration for a large variety of institutional clients including several REIT's. The valuation assignments have been on a variety of product types including large office, retail, multi-family, industrial, self-storage, hotels and senior living properties. Consulting assignments have also involved negotiating and underwriting loan transactions on a nationwide basis.

**J. P.  MORGAN**                    **Chief Appraiser (12/99-11/00)**
New York, New York
Analyzed, reviewed and valued individual assets in their $9 Billion dollar real estate portfolio. This involved being a member of the Investment Committee, writing quarterly reports and presenting them at J.P. Morgan Capital Markets meetings.  This activity also involved analyzing properties in the portfolio to make appropriate buy, sell and hold recommendations.

**ODYSSEY ASSOCIATES**                    **President (3/96-12/99)**
Tenafly, NJ
Provide commercial real estate valuation, consulting and acquisition services to a variety of institutions. These assignments have also involved the underwriting and due diligence of over $10 billion of new CMBS originations for CitiBank, Nomura, Chase, and CRIIMI MAE. The services provided have included research and technical expertise involving the analysis of commercial mortgage backed securities.

**THE PRUDENTIAL REALTY GROUP**                    **Chief Appraiser (5/90-3/96)**
Newark, NJ
Responsibilities included valuation for portfolio management, buy, sell, and hold decisions impacting annual policyholders' returns for 14 offices nationwide.  Analyzed the development and repositioning of properties in the portfolio and diversifying risk by optimizing the mix of property types and dollar size. This generated additional returns and saved money impacting the $6 billion dollar Prudential Realty Group equity portfolio.  Managed a staff of seven people in New Jersey and supervised approximately 35 analysts spread throughout the 12 other Realty Group offices.

## STANDARD AND POOR'S CORPORATION          Vice President (8/87-5/90)

New York, NY

Responsibilities included designing new criteria for the development of rating office, hotel, retail, and other special-use type properties. Developed a methodology to assess portfolio risk on a city-by-city basis as well as a plan to monitor and analyze portfolio performance on an ongoing basis. Marketed and developed a loan evaluation product used to assist in the sale of whole loan participation in the secondary market. Valued and analyzed over $3 billion of various commercial mortgage backed and other property involving many different types of structure and collateral. Was the lead real estate analyst on the Mellon Bank and Premier "Good/Bad Bank" transactions that involved the appraisal review and due diligence analysis on hundreds of properties estimated at over $1.5 billion.

## Grubb & Ellis          Vice President (4/82-8/87)

New York, NY

Responsible for the advising, coordinating, and development of real estate transactions for major developers and clients involved in acquisition, disposition, relocation, valuation, and lease negotiations. Saved $1 million for BMW by renegotiating lease, appraised many properties in excess of $125 million, advised Aetna, Fisher Brothers, American Can, and 500 Fifth Avenue on major transactions, and performed fee-based assignments for the General Service Administration.

## EDUCATION

- **Drexel  University,** Philadelphia, PA          M. B. A.  -  Finance (1981)
- **Wharton School,** Philadelphia, PA          B. S.  - Finance (1975)

## DESIGNATIONS

- **Counselors of Real Estate**          Member   (CRE)

- **American Institute of Real Estate Appraisers**          Member   (MAI)

## TEACHING

- **New York University,** New York, NY          Adjunct Assistant Professor
  Master's Program
  (Real Estate Capital Markets)

- **John Hopkins University,** Washington, DC          Adjunct Assistant Professor
  Real Estate Finance

- **The Prudential Realty Group,** Newark, NJ          Executive Training

## PUBLICATIONS

- **Real Estate Issues (CRE)**          Prices & Appraisals: Where Is the Truth?
  William S. Ballard Award

♦ **Credit Review/ Credit Week**                     Commercial Mortgage Pools & Securities

♦ **Real Estate Finance Review**                     Back To The Future

## AFFILIATIONS

♦ **Commercial Secondary Securitization Association (CSSA),** Chairman Seminars (1999)

♦ **Counselors of Real Estate (CRE), NY Chapter**          Chairman (2001 and 2002)

## COMPUTERS

♦ Working knowledge of: Argus, Microsoft XP & Power Point

Exhibit C

This Agreement dated the 6 day of JAN , 09 between First Republic Group Realty, LLC a Delaware limited liability company maintaining its offices at 241 Fifth Avenue, New York, New York 10018 (hereinafter "FRGR") and First Republic Group, Corp. a New York corporation company maintaining an office for the transaction of business at 241 Fifth Avenue, New York, New York, (hereinafter "FRG")

## WITNESSETH

WHEREAS FRGR is the landlord of certain properties located at Britt David, Georgia and Mayberry, North Carolina; and

WHEREAS FRGR has leased space to the US Army for a US Army Recruiting Center in Mayberry North Carolina, and to Dollar Tree in Britt David, Georgia; and

WHEREAS FRGR is now due reimbursement from the United State Army Corps of Engineers, for the build out of the commercial spaces that it has rented from FRGR in Mayberry North Carolina; and

WHEREAS FRGR is now due reimbursement from Dollar Tree, for the build out of the commercial space that Dollar Tree has rented from FRGR in Britt David Georgia; and

WHEREAS FRGR is justly indebted to FRG under cetain existing contracts pursuant to which FRG provides services to FRGR

NOW THEREFORE the parties agree as follows:

1.    FRGR hereby assigns all of its right title and interest in and to that certain reimbursement obligation of the United Stated Army Corps of Engineers to FRGR in respect of its commercial space in Mayberry North Carolina to FRG.

2.    FRGR hereby assigns all of its right title and interest in and to that certain reimbursement obligation of Dollar Tree to FRGR in respect of its commercial space in Britt David Georgia to FRG.

3.    FRGR's assignment under this agreement is made in consideration, and in partial satisfaction of, sums due to FRG under its existing agreements with FRGR.

4.    Notices. All notices sent hereunder shall be sent to the parties at their respective address set forth above by certified mail, return receipt requested.

5.    No Disclosure of Confidential Information. FRG shall not disclose to any person, firm, or corporation any trade, technical and/or technological secrets, any details of FRGR's organizations or business affairs, any names of present customers of FRGR or its affiliates or any other information relating to the business or businesses or their affiliates.

6.    Right to Ex Parte Relief. The FRGR recognizes that immediate and irreparable damage will result to FRG if FRGR breaches any of the terms and conditions of this agreement and, accordingly, the FRGR hereby consents to the entry of temporary, preliminary, and permanent injunctive relief by the New York County Supreme Court, which court shall be the sole court of competent jurisdiction, against FRGR to restrain any such breach in addition to any other

remedies or claims for money damages that the FRG may seek; and agrees to pay all costs and counsel fees incurred by the FRG in enforcing this agreement, which rights shall be cumulative.

7. Existence of Claims not a Defense. The existence of any claim or cause of action of FRGR against FRG whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by FRG of this Agreement.

8. Right to Injunctive Relief. FRGR recognizes and agrees that FRG does not have a remedy at law adequate to protect FRG's rights and interests as set forth in this agreement, and FRGR therefore agrees that FRG shall have the right to an injunction enjoining FRGR from violating the provisions of this agreement. Nothing herein contained shall be construed as prohibiting FRG from pursuing any other remedies available to FRG for such breach or threatened breach.

9. Attorney's Fees Recoverable. If any action at law or equity is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to recovery actual attorney fees, costs, and necessary disbursements, in addition to any other relief      and/or damages to which the prevailing party may be entitled.

10. Entire Agreement. This agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, understandings and agreements, whether oral or written, of any nature whatsoever with respect to the build-out reimbursement obligations that are the subject matter hereof, and there are no representations, warranties, understandings or agreements other than those expressly set forth herein between the FRGR and FRG

11. Modifications to be In Writing. This agreement is not to be changed, modified or terminated unless it is changed in writing, and signed by the parties hereto.

12. Governing Law. The validity, interpretation, construction and enforcement of this agreement shall be governed by the laws of the State of New York.

13. Severability. In the event that the Supreme Court of Manhattan County determines that this agreement is unenforceable in whole or in part for any reason, including, without limitation, the duration, scope, and remedies set forth above, then same shall not be void, but rather shall be enforced to the extent that same is deemed to be enforceable by said court, as if originally executed in that form by the parties hereto. Further provided that the invalidity or unenforceability of any particular provision of this agreement shall not affect the other provisions hereto, and the agreement shall be construed in all respects as though such invalid or unenforceable provision were omitted.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date herein.

First Republic Group Corp.                          First Republic Group Realty, LLC

By: _____          By: _____

ASSIGNMENT:

Know ye all Men by these Presents that:

First Republic Group, Corp. a New York corporation company maintaining an office for the transaction of business at 241 Fifth Avenue, New York, New York, (hereinafter "FRG") for value of $10.00 in hand paid, together other good and valuable consideration the receipt and sufficiency of which is acknowledged , does hereby ASSIGN without representation or warranty to Republic Funding all of First Republic Group Corp.'s right title and interest in and to certain build out reimbursement obligations due to First Republic Group Realty, as set forth in a certain contract bearing even date herewith between First Republic Group Realty, LLC and First Republic Group Corp.

FIRST REPUBLIC GROUP CORP., Assignor

By:_____

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF         )

On the 7 day of Jan 2008 before me, the undersigned personally appeared , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Receipt acknowledged :
REPUBLIC FUNDING

By:_____

_____
Notary Public

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF         )

On the 7 day of Jan 2005 before me, the undersigned personally appeared , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public